Our fourth case for this morning is Goudy v. Cummings, Mr. Dvorak. Certainly. Counsel, Your Honors, and may it please the Court. In this case, the evidence shows that the plaintiff, Walter Goudy, was innocent for a murder that he did not commit, but spent almost 16 years of his life in prison, and that the two shooters in this case were his half-brother, Romeo Lee, who is serving a essentially life prison sentence by Prosecutor Cummings' office, and Kaede Harvell, the subject of the Brady material. Now, this Court has already indicated in Goudy v. Basinger, in 2010, that Mr. Goudy's rights under Brady were violated, and that he did receive an unfair trial, and I think we have to start from that premise as well. Now, we have in this case two claims in three separate pieces of evidence. We have the first, which was a suggestive I.D. claim, and then there was a Brady claim based on more or less two pieces of evidence. So the suggestive I.D. claim was that this was a one-person show-up five months after the crime, after telling the witness, Jill Barclay, that Mr. Goudy was a suspect. The defendants do not contest the suggestiveness of this, they don't contest the unnecessariness, probably not a word, that it was unnecessary, and that it was unreliable. It is an absolutely outrageous identification procedure. Now, the Brady claim is based on two things, which would be the Kaede Harvell interview notes, which are found in the appendix to the brief at 29 to 32, and in that interview, Kaede Harvell denies any knowledge of the incident, the murder, and he provides a phony alibi. He obviously turns out to be a government witness after he flips, and he is actually the second shooter, and obviously that information was withheld from Mr. Goudy, which was the reason for his reversal by this court. So remind me, I'll tell you, one of the things I'm most interested in is how the problems that you're talking about, the Brady problems, the suggestive line-up problems, the videotape, the notes, why Cummings and the other defendant are the ones who are responsible for this. So we can start with the notes, Napier. So Napier and Cummings have this interview, I guess, with Harvell, and is that where the Well, they were found in the police file, but not the prosecutor's file. All right, so, and who wrote the notes? Who physically wrote the notes down? Napier was always the note taker, and Mr. Cummings was always the interrogator. All right, so Napier writes down the notes, and Cummings is there. Do we know that Cummings knew that these notes existed or had not been turned over, and does that matter? Yes, and it matters. Your Honor, we know that Cummings knew about it because in the, well, first of all, it's always the practice to put notes into a police report, and this was the only time in this entire case that Mr. Napier did not convert this into police reports. So there's this rule that I have to say struck me as rather odd, that these police reports are somehow outside the constitutional zone because they are work product of the police. How is that even possible? I asked every single attorney, including the person who argued it in front of the Indiana Supreme Court, how that rule even works, and no one could give me a straight answer. Has anybody attacked it as inconsistent with our hierarchical system of government? Not that I'm aware of. I believe it is actually still the law. It was certainly applied. I mean, I'm not going to. It didn't, well, I might have misunderstood what happened when Gowdy was here before, but wasn't part of the Brady evidence that he shouldn't have gotten those police reports or parts of those police reports? That when there are interview notes, in other words, inside police reports, I thought he was entitled to them, that despite the Indiana common law work product rule, that Gowdy 1 had said, no, it was a Brady violation not to give him those parts of the police reports. I might have misunderstood that. I should clarify. The notes were never part of the original. I understand that the Harville notes weren't. I'm just asking, generally speaking, yes, Indiana said police reports off limits. But in Gowdy 1, didn't we say, no, no, no, no, no, he should have gotten the access? Absolutely, yes. I guess what Chief Judge Wood's comment was, has it officially been overruled? So in other words, there are limits to this Indiana rule. I mean, you could redact, I presume, some opinion about something. But to the extent the police report, which is actually the way the regular work product rule works, too, in fact. The prosecutors and the police still have to comply with Brady, whether they do it in the physical form of a police report or not. That's obviously a quirk in Indiana law, I should say. But it becomes relevant when it comes to the videotape. And I didn't plan on getting this right away, but I might as well get into it now. That quirk becomes relevant because the police reports, yes, were part of the prosecutor's file. However, what was not part of the prosecutor's file, in which prosecutor, well, I should say, Detective Cummings originally took out the line of video and kept it, for lack of a better word, in a drawer someplace, because he has no explanation. As far as we know, he kept it in his kitchen. But what I can't, I mean, aside from chain of custody issues that would be troublesome to me about this, he does sign out with his own name and his police, not his prosecutorial hat, but his police badge. So why isn't it the case that anybody who wanted that video would go to the records and say, oh, Cummings has it, and then go to him and say, we need the video? What prevented that from happening? Well, I would say that with diligence, certainly the trial prosecutors could have tracked this down. Although when they went to the evidence locker, it was not there. It was physically not there. Is it possible that they asked, so we have their prosecutorial notes, one of the prosecutors put video, question mark, and slash A. Yes. So might there be a dispute of fact about whether they did ask Cummings? I mean, presumably they knew there was a video. Maybe they checked the evidence locker, saw the logs. It's possible, it seems to me on this record, drawing inferences in favor of your client, that they asked him and he said, oh, yeah, I don't know. I can't put my hands on that. Is that possible? In fact, that is correct, because with inferences towards the plaintiff, Paula Morris Roberts did testify that she searched for this videotape and could not find it. So I think, yes, that shows that prosecutor Cummings, defendant Cummings, police officer Cummings was withholding it from his own trial prosecutors. And when he returned it, I don't have a visual on how this works. So he returns it on the day that the magistrate issues this order to the evidence locker. At that point, have the prosecutors already cleared out the evidence locker of everything that they were going to use? And so there would have been no reason for them to go back there? Exactly. Exactly, Your Honor, because the defendants say it went exactly where it should have gone, which is the evidence locker. It should have stayed in the evidence locker so that when the prosecutors were looking to find it and tender it, because remember, Paula Morris Roberts says that had she had the videotape, the work product rule would no longer have been a fig leaf. That's what it is, a fig leaf. And she would have had to have tendered it. So it's actual causation, not theoretical causation. So when he belatedly turns over this video, is it your position, well, maybe he might have discharged his Brady obligation if he had gone and given it straight to the prosecutors? Exactly. Exactly. So although I think there's also lines from the case in, I'm blanking for a second on the case, but that indicates that it must be competent authority that you must give it to. And if you know that the people are not going to give it, then that's not discharging your Brady violation, your Brady obligations, Whitlock. Well, this all goes to the question of concealment or suppression, whether it was actually suppressed by Cummings. But the timeline certainly supports a reasonable inference that it was, because he kept it So I don't know what more we need than that. I'll move on. Can you talk about how the suppression of this evidence casts doubt on the verdict? Because we have the, let's say, the video, the show up, I have more questions about whether that, just cabin that for a minute for me. If we're talking about the Harville notes and the video, and we say, okay, there was a Brady violation here, explain why that would have cast doubt on the verdict. Because the other side says, hey, there were all these other eyewitnesses, and he was just one, and you have these other five eyewitnesses saying, yes, Gowdy did it. So why was Harville so important? Well, first of all, this court has already decided why it's important. But on the basis of other evidence, right? And Cummings wasn't responsible for the suppression of that evidence, right? Well, but he was. Because what the Seventh Circuit decided already was that all the information regarding the Harville lineups caused an unfair trial. Well, the videotape, had it been tendered to defense counsel, would have exposed all of this. So, yes, this issue has been decided, because had the videotape been in possession of defense counsel, he would have had both of his shooters. He would have been able to prove, my brother did, he was one of the shooters, and he says he did it with Harville. Now, Harville is being identified by other state's witnesses as the second shooter. There's our two shooters. I look more like my brother. I'm not the shorter guy. I'm probably the guy mistaken for my brother. And, oh, by the way, this is where the notes come into play in the synergistic effect that when Gowdy is first approached, he has nothing to hide. He cooperates. He even puts himself in a lineup. When, according to the notes, what does Harville do? He lies. He says he wasn't there. He gives a phony alibi. Remember, Walter was accused of giving a phony alibi, which turned out to be not true. He had a solid alibi. So I think the synergistic effect of this, and also to the notes, will show. We got a little off track on the notes as far as how do we know the individuals are responsible. It shows that both Cummings and Napier were actively concealing Harville or protecting Harville because in the second interview, after the notes are created, he starts his interview, and this is also in the appendix to my brief, appendix 35 to 36. You'll see that he says, we had a conversation earlier, Harville. Do you remember that? Oh, yeah, I remember that. We didn't talk about anything. You asked for a lawyer, right? Yes. Well, it turns out that's not true at all. It was an hour-long interview because if you look at from when he's Mirandized to when the Polaroid is taken, it's an hour-long interview where it's lie after lie after lie after lie after lie. But anyone who sees that videotaped interview, which was defense counsel, what he saw, would have thought he lawyered up. There's nothing here. So it's incredibly, incredibly material. And I also want to talk about, before I get into the suggestive lineup, it was in my brief in this case, which is page 47 to 48, which was not addressed by the defendants in their response, this idea of joint liability. Walter Gowdy received one unfair trial. He has one Brady claim. Suppose that perhaps he wouldn't be liable for one piece of evidence, but he would be for another because of prosecutorial immunity or retentive prosecution. As long as he contributed to that unfair trial, that person is a joint tortfeasor. And they're just as liable as the other tortfeasors. And, in fact, the restatement of torts indicates the person who is the other tortfeasor does not even have to be a party, as long as you contribute to that unfair trial. Think about the idea. Okay, why don't you get quickly to your other point, because your time is running out. Sure. I'll adjust on the other side, too. The suggestive ID claim. Yes. So, again, once again, it's just not even at issue that this is an outrageously suggestive show-up procedure. Totally unnecessary. The question of whether it was justified or, in fact, unnecessary, your client asked for the show-up. Doesn't that change the calculus? Well, okay, there's a few responses to that. First of all, there was not a very informed decision here because he was told that he couldn't get a real lineup until Monday, which turned out to be not true because he was put in a lineup within two hours. Second of all, Dr. Wells, our expert in this case, Exhibit R to our summary judgment response, as well as the Sixth Circuit decision in Gregory, says you don't have a right to choose whether you want to be in a show-up or a lineup. It's the police responsibility to give you a non-suggestive show-up. An innocent person may say, yeah, clear me. What do they know? They're innocent. But you can consent. I mean, you can waive all kinds of rights. And if he consented to and, in fact, asked for an immediate show-up instead of a lineup, Well, the Gregory case specifically says, I know it's a Sixth Circuit case, I understand that, but the Gregory case specifically says that the right is to have a non-suggestive identification procedure, not one to choose. And also, we have to remember this, too, is that there were also lies going on here because Rodney Cummings says, oh, the intent, and Steve Napier say that the intent to do this was to clear him. Well, if that's the case, again, inference most favorable to the plaintiff, Jill Barclay, the subject of that show-up, says she was told specifically by Napier, we have a suspect in custody. Okay, that's not something that was told to Mr. Gowdy when he allegedly consented. So it's uninformed consent. Uninformed consent, absolutely. And your point is that this suggestive show-up tainted all of her subsequent IDs, including the in-court ID. Absolutely. And it tainted her sister's ID as well. Absolutely, which is not contested by the defendants as well, which Dr. Wells explains. Now, with regard to the other evidence, because I know that Judge Barrett did talk about, what's this other evidence that was there? And, of course, in Brady, you don't have to show that was there sufficient evidence aside from the tainted. So we can already knock out two of those witnesses as being tainted. Nunn was the other person in the, Damon Nunn was in the car. He was in the front passenger seat. And through suppressed material that the Seventh Circuit already dealt with, they said suppressing that lineup with regard to Nunn was extremely prejudicial because Nunn identified a filler in the lineup. His credibility is nil because he just said, yes, that's a shooter, and it was a filler. The fourth person who testified testified from outside of the car, away from across the streets. It didn't have as good a vantage point. And she actually says that Walter was on the driver's side, which totally contradicts the other three witnesses. So there is zero physical evidence in this case, a strong alibi, an investigation that could be shown as corrupt. And that's why the Indiana courts, when given the chance, Prosecutor Brown, an independent prosecutor, dismissed this case and said there's no way we could ever win a connection on this, all because of this tainted investigation. Thank you. All right. Thank you very much. Do we have Mr. Overholt first? Yes. All right. Today I'll be speaking on behalf of Navy Aaron Cummings, his police officers. For three reasons, the district court correctly entered summary judgment in this case. First, the identification procedures did not deprive Mr. Gowdy of a fair trial. Second, the evidence about Harvell's initial denial of involvement was not sufficiently material, such that failing to provide the information to the defense violated his constitutional rights. Moreover, as the district court found, the prosecutors who tried the case were, in fact, aware of Harvell's initial denial of involvement, discharging any obligation of the police officers to provide that notice again. Finally, at the very least, the city defendants are entitled to qualified immunity. Here, the identification procedures did not violate Gowdy's right to a fair trial because there was identification evidence by three other witnesses that the plaintiff does not challenge. In other words, even if you accept that the testimony from Jill Barclay and Jacqueline Barclay were tainted, we have independent evidence from Damon Nunn and two other witnesses that Walter Gowdy was a shooter. Before you get into that, if I could clarify what you are and are not contesting on this show-up claim, are you conceding that the show-up was both suggestive and unnecessary? No. I think the show-up, because it was done with the consent of Mr. Gowdy. But that's contested, the knowing nature of the consent and what exactly was said. So I think there are some problems with the consent theory. Perhaps. And there are even bigger problems with telling the person, oh, we have the suspect, or words to that effect. I think the question I was asked was whether I conceded the point, and what I'm saying is I don't. Because of the fact, in part, again, Mr. Gowdy was asked, and as evidenced by the fact that Mr. Cummings released Mr. Gowdy after that show-up, it supports what he said, that he did it for the purpose of clearing him. He let him go and had a subsequent line-up later. Which, that's the other tainted line-up, though. Isn't this the one where the witness knows the four fillers? As it turned out by coincidence, that's true. Oh, this is just two hours later. Pretty awful. So he's still in custody when the first line-up is done. Correct. But the police can't be faulted for the fact that Jill Barclay happened to know, by coincidence, some of the people in the line-up. Well, didn't they figure that out ahead of time? I'm not sure how. I mean, they went and got some fillers who looked similar to the witness, and I don't know how they could possibly know. I mean, they didn't conduct an interview with her after she made the ID, and did she disclose that I know everybody in this line-up? Well, I think she did disclose that she knew them when she saw the line-up. So they all march into the line-up room. She's behind glass, and she says, Oh, I know all those people. And then this one other person that I've just been shown a little while ago. I can't answer that question because I don't recall specifically how that played out. Other than I know, when the line-up occurred, she acknowledged that she knew some of the people in the line-up, and therefore another line-up was done by her. Was this all part of the trial testimony? I don't remember whether it was in the trial testimony or whether that came up. Whether that was, I don't remember. In the suppression hearing, maybe? That's where I believe it was, but I cannot say that for sure. But typically it would also be part of the trial testimony. Yes, I would expect so. I would expect so. I just don't recall. Counsel, on the notes, on the Harvell notes and the video, you say, Oh, well, there's no question of fact about whether your clients turned over the materials because the prosecutors knew about them. But is that right? I mean, they said they knew about them. So Puckett says, Yeah, I was aware that Harvell denied involvement when he first went to the station. He said, I wasn't there. I didn't know anything. But that's not the same thing as him saying, Yes, I had the notes in my possession. He could have morally been told that. Presumably Cummings briefed him on the case when he assigned it to him. The same with the video. I mean, we don't have any testimony that I saw on the record or any proof that the prosecutor said, Yes, we had the notes and the video in our possession. But for purposes of Brady, what matters is the information be communicated. Here what we have is the undisputed, unchallenged testimony of one of the deputy prosecutors who said, I knew that Harvell initially denied his involvement. But he can't say how he knew that. And he can't give the notes if he doesn't have them. And he can't give the video if he doesn't have them. That's right. It's turning it over to the defense, too. It's not just the prosecutor sitting around knowing things. Well, but if he knows that that denial of involvement was communicated to him, it would be his obligation to make sure, as the prosecutor, that that information then gets communicated to the defense. It's the responsibility of the whole team. The Supreme Court's been very clear about that. You can't say, Oh, you know, somebody else was going to do it. Right. But what we know is the police communicated that information to the prosecutor. The prosecutor then has an obligation to discharge or provide that information to the defense. Heads up. Harvell says initially, I kind of have this sense that Harvell said he wasn't there, but I can't give you the notes that you could really use as impeachment fodder at the trial. I mean, the notes are what he wants. The notes are what he was entitled to get under Brady. And the same for the video. Well, he was entitled to get the information, right? He's entitled to get the notes. I mean, is he supposed to stand there with a lot of hearsay evidence that, you know, you're lying? Well, actually, it's interesting. The notes themselves. One of the things we point out in our brief is he asked that question. He started down that very line of questioning, stopped because there was an objection, and didn't go back to it. So he specifically started to ask those questions about Harvell. But if he'd had the notes, he would have had impeachment evidence in his hand. And another question now, and of course the resolution reached by the district court is, even assuming that that information was not material, it was not sufficiently material, what matters is the fact that he admitted his guilt. He admitted his involvement in a murder. And in terms of materiality, what matters is that statement or that admission of involvement in the crime, not the fact that he, like virtually every other criminal defendant, initially says, oh, that's not me. He didn't admit he was the shooter. He places himself at the scene. Correct. Yes, because he was involved in the murder. That's very different. Bystanders are not necessarily involved in murders. You're jumping from being at the scene to the murder. Gowdy doesn't admit he killed anybody. Harvell admitted that he was involved in this murder. He admitted he was involved in the crime of trying to jack this guy's rims. Under Indiana's law on felony murder, his admission that he was involved in this felony is sufficient to charge him with felony murder. Was Cummings overseeing? I mean, you know, he's the head of the office. He's a county prosecutor. Is he overseeing the prosecution of this case by the line prosecutors at all? No. No, the evidence in the case is he was not, that this was being done by the two deputy prosecutors without his involvement. But he is interviewing Harvell in April of 1995 after he is, in fact, the prosecutor. He's doing stuff. He's actively involved, actually. Not to mention taking the video away, but that's a whole different topic. Well, as to the video, he got the video out of the evidence locker in September of 1994. At that point, there was still an open homicide investigation. There were no charges pending against Mr. Gowdy or anyone else. But it stays out for so long, and then he just slips it back in at the last second. And he couldn't, I mean, as I say, I have custody issues about this, in fact. What happened to it during all this time? Well, I wouldn't say it was the last second. It was put back in the evidence locker after the hearing saying the videos need to be produced. And he never hid anything. He signed it out under his own name. He's the boss, and so the videos need to be produced. And you're saying so he was compliant because he knew the videos had to be produced, so he put it in the evidence locker, but he's the boss. He knows his line prosecutors have an obligation to disclose this Brady material, and he doesn't bring the video to them? He puts the video, he signs it out under his own name when he's a police officer. Shortly before the case goes to trial, there's an issue about producing videos. It's there under his own name. Anybody looking in that evidence locker would have seen he's the one who checked it out. He goes and returns it and puts it back exactly in the place it's supposed to be. But long after, the order to produce the videos is October 23rd. By November 14th, it's still not there because we have videos of line up question marks still N-A. And then, only in November 22nd, that's why I say he slips it in at the last second. The trial court says, you know, I'm sticking with my earlier evidentiary ruling. That's the day he puts the video back in the property room. He doesn't give it to the prosecutors. He doesn't facilitate its being produced in accordance with the month-ago order of the court. But it goes in weeks before the trial when the court confirms that it has. But after discovery is closed, you know. Well, the judge said on the 22nd of November, no more discovery. So only then does he put it back in the evidence locker when it's, when the defense has been foreclosed from obtaining it. But the court could have, or the defense still could have looked at any of the videos, including that one. A defense lawyer has to file a motion every day saying, would you please go back and check the evidence locker again to make sure nothing's reappeared? I mean, that seems onerous. Again, because he, well. And from what we know about Indiana's procedures, there is no open file policy as there is in some states. There is not. Where the defense has access to everything that the prosecution has access to. I don't know if that's a statewide policy. That was the policy of this particular prosecutor, yes. Well, right. And there's some statewide common law rule that police reports are work product, attorney work product. I see I've gone over my time. Thank you. Thank you very much. Ms. Weiss. Good morning. May it please the court. I represent defendant Mr. Cummings in his capacity as Madison County prosecutor. This court should affirm the district court's decision that Mr. Cummings did not withhold the line of video in violation of Mr. Gowdy's Brady rights for the following three reasons. First, the line of video was not suppressed. Second, there is no duty to turn over exculpatory evidence before charges are filed. And third, the requirements of Brady did not apply to Mr. Cummings because he did not actually prosecute Mr. Gowdy's case. Turning to my first point that Mr. Gowdy has failed to show a Brady violation because the line of video was not suppressed. As my co-counsel mentioned, although he kept the video in his possession for about 14 months, he did not conceal this fact. And he used his own name and ID badge to check out the video and returned it before the trial began. The Supreme Court held in the United States v. White that evidence is not suppressed when the defendant has access to it before trial. And here, Maynard did have access to it before trial. He didn't have access to the videotape. He could have gone to the police evidence room to view the video at any time as per the court order. The video was not there. As of in November, it was there. He could have viewed it at that point. Discovery has been cut off. If the defense has been told by the judge, you get nothing else after this stage. Yes, but that would go to the prosecutors who prosecuted the case. But it doesn't go to the question whether it's Cummings who conceals this, who makes sure that he can't get at it. And, again, the prosecution is a team. You can't sort out and say, well, the police had it, the assistant state's attorney didn't have it, and all of that. It's a team, and Cummings is playing a role. As he's checking out of this video illustrates, he's not some remote head of office who doesn't know anything about this prosecution. Well, it's undisputed that he did not have any role in the discovery process in that. Except by concealing this video. I mean, he did. Right. The hat he's wearing during the entire period of concealment is that of an investigator because he removes it from the evidence locker as an investigator. He keeps it in his personal custody as an investigator until the prosecution succeeds in getting a judicial order shutting down all discovery. Only then does he put it back. He's not acting as a prosecutor during any of this conduct. Well, that would lead me to my second point that he would be entitled. So the district court found that he had absolute immunity as a prosecutor. Right. I'm pushing back on that. That he did not have absolute immunity? Right. During this entire course of conduct, he is not acting as a prosecutor. The only thing he did as a prosecutor is authorize the charges, and then he washed his hands of it and turned it over to the other two prosecutors. So he's not literally or even functionally acting as a prosecutor at the time he continues to conceal the videotape in his personal custody. But Mr. Gowdy doesn't challenge the fact on appeal that he had absolute immunity as of April 7, 1995. No, but actually what he does say, though, and our case law certainly firmly supports this, is that prosecutors can wear a couple of hats. You can wear your hat as prosecutor, but sometimes prosecutors wear the hat of investigator, at which point the only immunities that they're entitled to are the same as the immunities that other investigators, such as police officers or others, have, which would be at the most qualified immunity. Absolutely. So during that— And I don't think Mr. Cummings has waived that point at all. So during that time, so from January 1st when he was sworn in until April 7? It depends what he's doing. If he were in court saying, I am hereby prosecuting, then he's a prosecutor. But if he's out there playing around with the evidence, he's an investigator. So there are two different time periods. From January 1st, 1995 when he was sworn in until April 7, 1995, before charges were filed, he would be entitled to qualified immunity because at that point there's no duty to turn over exculpatory evidence before charges are— It's not a question of the timing. He could be a prosecutor in the morning and an investigator in the afternoon. It's a functional test that the Supreme Court has adopted. Right, and the time frame doesn't really matter. The violation occurs—that's a due process violation at trial because the case proceeds without this evidence being in the defendant's hands. Correct, but so before April 7, there is no duty to turn over exculpatory evidence. You're missing my point. Okay. The timeline doesn't really matter much here. The violation occurs because the case is prosecuted against him, and he's in the dark about the existence of this videotape. Who's responsible for that? Cummings, and he's responsible for it in his status as an investigator, not his status as a prosecutor. The only thing he did as a prosecutor in this case is authorize the charges, but his relationship to the case in the course of his whole conduct vis-à-vis this videotape was as an investigator. And he clearly had a duty to disclose the tape at a time when it could be useful at trial, and he didn't do that. He didn't return it to the evidence locker until after discovery was cut off. But at that point, Prosecutor Maraz and Prosecutor Puckett could have— it was their duty, not his, to turn over the— They didn't have it. But they could have easily looked at the police evidence locker. As an investigator, he continues to have a duty. He knows this exists. He has kept it concealed for 14 months. He knows it's material, and he doesn't turn it over to the prosecutors or the defense. He's got an ongoing Brady duty. But that's not—the standard is as long as the opposing counsel has access to it before the trial begins, then there's no— Nobody did have access to it. The defense team did not. They asked for it early. The videotapes were ordered. At that time, this videotape is still not in existence as far as anybody other than Cummings is concerned. He's the only one who knows about it. But once he did return it to the police evidence locker room, as per court order, Maynard could have— That's not a disclosure. It's his affirmative duty to disclose it. Well, during that time, going to my second point, he still would have been entitled to prosecutorial immunity as— But the district court found that. It doesn't matter. This is summary judgment. District courts don't make findings on summary judgment. It matters what the evidence shows. It's de novo review. But even though the opposing counsel doesn't challenge that conclusion on appeal? He does. But he does. He's cited all of the relevant cases about the capacity in which a person with the title prosecutor might be acting, and when that individual is acting as an investigator, the employer against Pacman absolute immunity does not apply. That's just the law. It's been that way for a long time. But if I'm understanding your question correctly, he raises the argument that Mr. Cummings was not liable as— was not entitled to absolute immunity for the first time in his reply brief, which in that case it had been waived. He doesn't discuss that in his initial brief. Well, okay. We will take that as your response to this point. So, point duly made, and I think I'll have to cut it off at this point. Thank you. Thank you very much. And I'll give you just a minute to wrap up, Mr. Dvorak. You've been a little lengthy on all of this. I guess I didn't have time to quick look. But certainly we raised that issue, and we definitely did challenge the issue in conceding that that time matters. A couple of very minor points, then I'll be done, is when counsel indicated why would he have let Mr. Gowdy go after the show-up, turn it on its head. It's the exact opposite. He knew that that was nothing evidence, and how could you possibly get a murder indictment based on a one-person show-up five minutes after the shooting with no other physical evidence? He didn't charge him because he had no evidence. It just shows that he was consciously aware of the weakness of that show-up. And then also, too, one final point is that all that matters is what the final statement of Harvell was. Well, he finally, finally, he admitted his involvement in this. Of course, a defense attorney with the notes and all the other evidence in this case would have shown the whole way that he lied and lied and lied and lied, and then he was given a deal, and now all of a sudden he's saying it's welfare. So the end product is not the sole evidence. Thank you. All right. Thank you very much. Thanks to all counsel. We will take the case under advisement.